UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GISELE DUPREZ,

                         Plaintiff,

        - against -

DOCUSIGN, INC.,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Gisele Duprez ("Plaintiff" or "Duprez"), through her attorneys Vladeck, Raskin & Clark, P.C., complains of defendant Docusign, Inc. ("Defendant," "Docusign," or the "Company") as follows:

<u>NATURE OF THE ACTION</u>

1.     For over two years, Docusign, whose customers include banks that are subject to numerous regulations and robust government scrutiny in connection with safekeeping of data, has lied to its customers about data storage and concealed its transfer of data from on-premise servers to Microsoft Azure cloud-hosted servers ("Azure Cloud Servers"). Repeatedly, Docusign made affirmative misrepresentations and material omissions about the subcontractors it works with and where it stored customer data, including as part of customer audits and attestations. Docusign asked its employees, including Duprez, to participate in the fraudulent scheme by providing them with false FAQs and scripts for conversations with customers about the status of the data migration, including repeatedly referring to it as an "upcoming" event when, in fact, it had already taken place. The deceptive and unlawful practices have permitted Docusign to move data from its failing on-premise servers to the Azure Cloud Servers without objection or scrutiny by its customers, who

undoubtedly would have raised concerns about the process given their legal obligations to protect data.

2.     Moreover, Docusign has engaged in a cover up to avoid losing customers and millions of dollars in revenue.  After Duprez discovered Docusign's fraud in late May 2025, she repeatedly raised concerns throughout June 2025, including complaining to senior managers and internal legal counsel, and demanded that the Company fully and accurately notify customers about its data migration.  Rather than remedy the problem, the Company directed its employees not to put their concerns about the undisclosed data migration in writing to the Executive Leadership Team; to delete internal communications about the data migration; and to designate reams of communications as attorney client privileged even though such information plainly did not satisfy the applicable standards.  To this day, Docusign continues to dissemble by making partial disclosures to its customers about the data migration.

3.     Duprez reasonably believed that Docusign's fraudulent representations and material omissions to its customers, including banks, constitutes unlawful conduct, including, inter alia, (i) fraud, including wire and/or mail fraud; (ii) violations of U.S. Securities and Exchange Commission ("SEC") rules and regulations such as Docusign's duties to maintain adequate internal controls to prevent and detect material misrepresentations, to keep accurate and reasonably detailed books and records, and not to use fraudulent, manipulative, or deceptive practices in connection with the purchase or sale of a security; (iii) other violations of Federal laws relating to fraud against shareholders; and (iv) privacy rules and regulations designed to protect sensitive customer information.

4.     Docusign's actions made it impossible for Duprez to continue to work there. Duprez spent years before and since joining Docusign building her reputation as a trusted strategic

account director for key customers, including large financial institutions. She would have damaged her career by continuing to work for a Company that has engaged in fraud and deceit against its customers for years. Nor could she return to a job where the Company is asking her to be part of the unlawful and unethical conduct. Indeed, the Company's actions have caused Duprez to suffer significant distress, and, as a result, her health has deteriorated, which forced her to take an extended leave of absence for medical reasons. Following the start of Duprez's medical leave pursuant to the Family Medical Leave Act, Duprez's compensation was significantly cut. Docusign did not pay her any salary or commissions between July and the end of December 2025, compensation she would have received but for the Company's unlawful conduct.

5.      Duprez's medical leave expired on December 30, 2025. At that time, Duprez was unable to return to work at Docusign due to the Company's ongoing unlawful actions, including its failure to investigate the illegal conduct that Duprez reported; its efforts to suppress any disclosure by deleting documents and designating them as subject to attorney-client privilege; and its failure to disclose to its customers its fraud. Duprez was thus constructively discharged. As a result, Duprez has ongoing lost wages, including, but not limited to, her base salary, her commissions, and her unvested equity.

6.      Plaintiff brings this action to remedy whistleblower retaliation for her protected activities under the New York Labor Law § 740 (the "Labor Law").

7.      Plaintiff seeks declaratory and injunctive relief, compensatory, liquidated, and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief.

JURISDICTION AND VENUE

8.      Jurisdiction of this Court is proper under 28 U.S.C. § 1332. First, the parties have diversity of citizenship. Plaintiff is domiciled in New York. Pursuant to 28 U.S.C. § 1348, Docusign is incorporated in the State of Delaware and maintains its principal place of business in the State of California. Second, the amount in controversy exceeds $75,000.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff worked for Defendant in Brooklyn, New York and because substantial events that form the basis of this action occurred in Brooklyn, New York.

PARTIES

10.     Duprez is an experienced sales executive who worked for Docusign between June 2022 and December 2025.

11.     Docusign, Inc. is a publicly traded corporation headquartered in San Francisco.

FACTUAL ALLEGATIONS

Duprez's Background

12.     Duprez is a successful enterprise sales strategic account director. In this role, Duprez has effectively led teams and served as the primary contact for major customers; she has successfully retained key existing accounts; and she has played a critical role in developing and implementing strategic plans to increase sales and to expand market reach.

13.     For approximately 25 years, Duprez has been working in customer success and sales.  During this time, she has primarily handled enterprise accounts, which are the largest accounts in terms of revenue.  Over the course of Duprez's career, most of her enterprise clients have been financial services institutions and banks.

14.     For example, before joining Docusign, Duprez worked in senior sales and customer success positions for software companies, including Salesforce as a Director, Global Client Services Executive; Chordiant Software as a Director, Enterprise Accounts; Framehawk as a Global Director, Enterprise Account Executive; Actimize as a Director, Customer Account Executive; Kaltura as a Senior Director, Strategic Accounts: and Avoka as a Consultant and Senior Director, Global Account Manager.

15.     In Duprez's prior roles, she managed sales account teams for global financial institutions, including large international and domestic banks, which generated substantial revenue for the companies that employed her.  In some of those jobs, Duprez oversaw accounts and contracts valued at over $10 million and $25 million.  In some of those jobs, Duprez reported to the highest levels of the company, including the chief executive officer ("CEO").

16.     In or around June 2022, Duprez joined Docusign as a Strategic Account Director, Financial Services and Insurance.

<u>Docusign Background</u>

17.     Docusign is an international software company that provides products and services to organizations to manage electronic agreements with electronic signatures.  Among other products, Docusign eSignature enables users to upload documents, define signers, add signature fields, and send documents for legally binding electronic signatures. In addition, Docusign provides "Contract Lifecycle Management," where the Company stores and reviews contracts and can extract specific contracts based on specific searches and provide those contracts to the customer; and identity verification, such as providing one-time passcode and background checks.

18.     Docusign boasts that it has more than a million customers and a billion users.  Many of Docusign's high revenue clients are major domestic and international financial services firms,

including, but not limited to, Bank of America, Wells Fargo, Goldman Sachs, Citi, JP Morgan Chase, and Fidelity.

19.     Docusign receives, stores, and transmits a significant amount of data for its customers, including its financial services customers.

<u>Duprez's Tenure at Docusign</u>

20.     Duprez worked for Docusign for more than three years until the Company constructively discharged her in December 2025.

21.     In Duprez's former role as Strategic Account Director, Duprez acted as CEO for a portfolio of Docusign's largest financial services accounts, including Bank of America, Wells Fargo, and Goldman Sachs.

22.     During Duprez's employment, Bank of America was Docusign's largest customer in terms of revenue and e-signature transactions. In addition, Wells Fargo and Goldman Sachs were among Docusign's highest revenue customers.

23.     Duprez's portfolio was among the three largest at Docusign in total revenue for individual contributors within Sales.

24.     Duprez was exceptionally successful throughout her tenure at Docusign.

25.     By way of example:

        a.     Docusign has a fiscal year that runs from February of the year preceding the fiscal year to January ("Fiscal Year"). For example, Fiscal Year 2025 started in February 2024 and ended in January 2025.

        b.     For Fiscal Year 2023 (the period from February 2022 to January 2023, of which Duprez worked at Docusign between June 2022 and January 2023), Duprez met or exceeded

many of her metrics, including 478% of her annual ramp quota (i.e., her expansion quota for her first partial fiscal year).

c.       During Fiscal Year 2024 (which included the period February 2023 to January 2024), Duprez generated and closed sales that have a contract value of approximately $35 million and exceeded her retention quota.  Based on Duprez's efforts during Fiscal Year 2024, the Company awarded her its 2024 Values Pro Award after she successfully negotiated and completed a deal with a top global financial institution worth approximately $27 million. Docusign asked Duprez to present the deal as an example of a success story during a Company-wide town hall.

d.       For Fiscal Year 2025 (which ran from February 2024 to January 2025), Duprez achieved 181 percent of her expansion quota and exceeded her retention quota.   Docusign named Duprez to its President's Club, which is an honor reserved for the top 10 percent of quota achievers at Docusign.  Out of 730 sales employees at Docusign, Duprez was ranked number 39 in terms of total quota achievement. Her fiscal year 2025 performance evaluation was extremely positive and rated her "Significant Impact."

Docusign's Ongoing Fraud

A.      Docusign's Legal and Contractual Obligations to Protect Customer Data

26.     As set forth above, as part of the products and services that the Company provided during Duprez's tenure, Docusign was obligated to manage, store, and protect customer data. Docusign stores, among other data, highly sensitive information for its customers, including, but not limited to, information that can be used to distinguish or trace an individual's identity ("Personally Identifiable Information"); information about confidential commercial transactions; and other financial information.

27.    Docusign's customers included banks and other financial services institutions, which are subject to strict regulatory oversight and numerous legal obligations to safeguard their own customer's data, including, but not limited to, pursuant to the General Data Protection Regulation ("GDPR") and the Gramm-Leach Bliley Act ("GLBA").  In addition, the Securities and Exchange Commission has rules that require registrants to disclose material cybersecurity incidents they experience and to disclose on an annual basis material information regarding their cybersecurity risk management, strategy, and governance.

28.    Docusign's bank customers were obligated to ensure that their vendors and subcontractors were properly and lawfully storing their own customers' data.  As part of this process, Docusign's banking customers, including Bank of America, regularly sought assurances that Docusign was safeguarding its own customers' highly sensitive information.

29.    For example, during Duprez's employment, Bank of America regularly sought semi-annual attestations from Docusign identifying any subcontractors that the Company used to provide the bank products and services.  In addition, during Duprez's employment, Bank of America conducted annual audits and made requests for representations, which included inquiries concerning data storage.

30.    Upon information and belief, the Company's customers, including the banks, relied upon Docusign's audits and attestations in making representations to regulators concerning their compliance with applicable laws.

31.    In addition, as part of the Company's contracts with its customers, including Bank of America, Docusign was obligated to maintain appropriate measures, including information security policies and safeguards, to preserve the security, integrity, and confidentiality of customer data and to protect against unauthorized or unlawful disclosure or corruption of or access to

personal data.  Docusign was also obligated to provide assistance and information to its customers in connection with the customers fulfilling their legal obligations to protect data, including responding to audit requests.

32.     Some of the customer contracts, including the contract between Docusign and Bank of America, required that the Company notify customers of significant changes that may affect the security of confidential information, specifically including the storage or processing of data in a cloud or multi-tenant environment. Under the contracts, non-compliance constituted a material breach and could lead to termination of the contracts.

B.     Docusign's Material Misrepresentations and Omissions

33.     When Duprez joined the company, Docusign stored its clients' data on Docusign's on-premise servers, including a server known as "NA2."

34.     In or around 2023, Docusign began to move client data from NA2 to a cloud-based platform hosted through Microsoft Azure.  By September 2024 at the latest, the Company had migrated all of the data to the Azure Cloud Servers, including all files, all database configurations, and all templates.  As a result, the cloud-based server hosted through Microsoft Azure was a mirror image of the information that the Company stored on NA2.

35.     The data that the Company migrated to the cloud server could not be returned to NA2 even if a customer knew about the information transfer and had requested a reversal.  Upon information and belief, NA2 was a dysfunctional and broken system.

36.     Despite legal and contractual obligations, Docusign did not notify customers, including Bank of America, about its data migration. Customers, including Bank of America, could terminate their contracts with Docusign based on the Company's failure to notify them about moving their data to Microsoft Azure Cloud Servers.  If customers were to cancel their contracts

based on this blatant breach, Docusign could lose millions of dollars in revenue. In addition, disclosure of Docusign's fraud would harm its reputation and likely cause the Company challenges securing new business and therefore result in significantly reduced earnings.

37.     Docusign continued to conceal the cloud migration from its customers throughout 2024 and into 2025. Among other things, Docusign repeatedly told its employees, including Duprez, not to discuss Microsoft Azure with its customers. The account team, including Duprez, incorrectly believed that Docusign had instructed them not to discuss the migration because it was premature to do so. The account team understood that talking about a future plan to move data to the Azure Cloud Servers would alarm customers and require careful planning with them.

38.     Not only did Docusign fail to advise its customers that the Company had moved data to Azure Cloud Servers, but Docusign repeatedly made affirmatively false representations and omitted material information to customers, including Bank of America. In attestations, Docusign failed to notify Bank of America that its subcontractors included Microsoft Azure. During audits and in other written disclosures, Docusign made false statements to, inter alia, banks, by claiming that the Company stored the entirety of its customer data on Docusign's on-premise servers, including NA2.

39.     For example, in or around March 2025, Maggie Adams ("Adams"), Customer Success Account Manager for the Bank of America Docusign account team, hosted Bank of America representatives for an onsite audit. During the audit, a Docusign internal auditor from the Trust and Security team answered technical questions that the bank posed. Docusign's representation to the bank that the Company was storing all of its data on the NA2 server was not accurate. Adams, at the Company's direction, also completed an attestation for Bank of America

identifying subcontractors that the Company used, which omitted key information. Specifically, the attestation did not identify Microsoft Azure as a subcontractor.

C.     Docusign Announces Plan to Notify Customers Falsely About an Upcoming Migration

40.     In 2025, the Company prepared materials for its customers falsely stating that there would be an "upcoming" data migration from Docusign's on-premise servers, including NA2, to the Azure Cloud Servers.

41.     In or around May 2025, Duprez learned that Docusign was purportedly planning to migrate customer data to the Azure Cloud Servers in 2025 and 2026. Duprez received an email on behalf of Docusign's CEO from the senior engineering team directing that Docusign account teams contact certain customers, approximately 10 to 15 customers, concerning the allegedly forthcoming cloud migration. Duprez was responsible for Docusign's relationship with a few of those customers, including Bank of America.

42.     As part of this purported rollout, Docusign provided materials to its employees. Those materials included alleged facts about the "upcoming" migration and directions for communicating with clients about it.  For example, those materials provided a purported schedule for when the migration would begin and end, which varied based on the type of customer account. The schedule specified that migration for information stored on the NA2 server and other Docusign servers would happen between August 2025 and May 2026.

43.     Even though the materials clearly specified that Docusign had already migrated customer information stored on certain Docusign servers located in countries outside the United States and Europe, it did not make any such disclosure for data on the NA2 server nor other North American and European based Docusign servers.  To the contrary, the materials stated explicitly

that the information "<u>will</u> be moving  from [Docusign's] on-premise servers to Microsoft Azure." (Emphasis added)

44.    The Company's rollout materials also included a model email that Docusign intended to be sent from its Product Management team to its customers.  The email plainly stated that the migration would occur in the future without any acknowledgement that Docusign had already migrated information: "I want to make you aware of, and solicit your feedback on <u>upcoming</u> operational and infrastructure changes.  I'd like to meet to discuss our plans for our <u>upcoming</u> system transition and would love to get your feedback." (Emphasis added) The Company continued to instruct employees to be cautious and not to mention Microsoft Azure to customers.

D.    <u>Docusign Continues to Mislead Its Customers</u>

45.    For multiple years, Docusign made false representations and material omissions about managing and storing customer data, including sensitive personal information.

46.    Even though Duprez raised concerns about the misrepresentations and even though the highest levels of the Company were aware of the unlawful conduct, on information and belief, the Company has continued to conceal from clients that the Microsoft Azure cloud migration had already occurred.  On information and belief, Docusign was concerned that if it disclosed the full scope of its misconduct, it would have lost customers and millions of dollars in revenue. Furthermore, such disclosure would have negatively affected Docusign's reputation and its ability to secure business moving forward and thus reduced its revenue for the foreseeable future.

<u>Duprez's Protected Complaints</u>

A.    <u>Duprez Learns about the Misconduct</u>

47.     When Duprez learned that the migration had already happened, she immediately began raising concerns to her supervisors and to Docusign's legal team.

48.     In late May 2025, Duprez traveled to Charlotte, North Carolina with Mangesh Bhandarkar ("Bhandarkar"), Group Vice President of Product for Docusign, to attend a forum that Bank of America held for its key vendor partners. During their time in North Carolina, Bank of America's Chief Technology and Information Officer gave a speech about the importance of the bank meeting its compliance obligations and about the importance of vendor transparency to build trustful relationships with the bank.

49.     On May 28, 2025, Duprez had dinner with Bhandarkar in Charlotte. During that dinner, Bhandarkar told Duprez that the cloud migration had already taken place. Based on Docusign's representations to its employees as described above, Duprez had previously understood that the migration had not yet begun and would take six to 18 months to complete once it did commence.

50.     Duprez was shocked to hear that the migration had already taken place and that Docusign was intentionally misleading its customers, including Bank of America, about data storage.

51.     Duprez was extremely concerned that Docusign's misrepresentations had caused Bank of America and presumably other Docusign customers not to be in compliance with regulations concerning data management, security, and storage.  Duprez was also concerned that the Company's actions breached its contracts with Bank of America and other customers.

52.     Duprez told Bhandarkar that it was a "problem" that the migration had already occurred, and he agreed. Duprez said she needed to notify her manager, her second-line manager, and the Company's Legal team.

B.    Duprez Complains to Legal Team and Her Managers About the Fraudulent Conduct

53.    Throughout June 2025, Duprez made repeated complaints about the Company's misconduct.

54.    On June 3, 2025, when Duprez had returned to the office following her trip to North Carolina, she opened a case with the Legal team and asked that Natalia Jhaveri ("Jhaveri") perform a contract review to determine which provisions of the Company's contract with Bank of America that Docusign had violated by making misrepresentations about the migration.

55.    Duprez then complained to her managers about the Company's unlawful conduct, including Daron Balducci ("Balducci"), Regional Vice President, Enterprise Sales Management and her direct manager; and Mike Cipolla ("Cipolla"), Area Vice President, Enterprise Sales, her second-line manager.

56.    Thereafter, over the course of the next few weeks, Duprez repeatedly complained about the misconduct.  She raised concerns to the Legal team, her managers, and senior executives and leaders of the Product and Engineering teams, including Balducci; Cipolla; Bhandarkar; Jhaveri; Cindy Rosser ("Rosser"), then-Deputy General Counsel for Docusign; Henry Senger ("Senger"), Group Vice President of Engineering; and Adams, a Customer Success Account Manager on the Bank of America team.

57.    During these meetings, Duprez insisted they needed to understand exactly what had happened, including, inter alia, what data had been moved and when the move took place.

58.    Duprez raised concerns that the planned communications to Bank of America were deceptive, including by making it seem as though the data migration had not happened yet. Throughout June 2025, Duprez repeatedly advocated for the Company to disclose to Bank of America as soon as possible the truth about the migration. Duprez made clear that she was

concerned because some of the customers, including Bank of America, were in heavily regulated industries; were subject to rigorous scrutiny by government regulators; and that, as a result, they may be required to disclose to regulators at any time where their data was stored.

59.     Duprez drafted an email to send to Docusign's Executive Leadership Team ("ELT") raising concerns about, among other things, that Docusign's misrepresentations had caused Bank of America and presumably other Docusign customers to be in violation of regulations concerning data management, security, and storage and that the Company's actions breached its contracts with Bank of America and other customers.  While Duprez's second line manager Cipolla supported Duprez's efforts to send the email to the ELT, Senger, an Engineering executive at Docusign, repeatedly instructed Duprez not to send it.

C.      The Company Directs Employees Not to Disclose Misconduct and to Delete Information

60.     Following Duprez's complaints, Docusign instructed Duprez and others to take steps to further cover up the fraud and ensure plausible deniability.  The Company sought to do so by instructing employees not to put their concerns in writing to the ELT, to delete correspondence from Slack, and to label as attorney client privileged all communications about the matter to protect it from discovery in potential future litigation.

61.     On June 11, 2025, Duprez joined a meeting already in progress with Rosser, Jhaveri, and Adams. Shortly thereafter, Senger joined the call as well.

62.     During the call, Senger said that the ELT was already aware of the migration issue and that his first-line manager, Sagnik Nandy ("Nandy"), Docusign's Chief Technology Officer and Executive Vice President, Engineering, had instructed employees not to discuss it in writing with the ELT.  Duprez then realized that Senger had repeatedly told her to wait before sending the email she had drafted to the ELT because of Nandy's instruction.   In response, Duprez raised a

concern that they were being directed not to escalate in writing to permit "plausible deniability" by the Company's senior executives.

63.     Rosser then told everyone on the call that they now possessed knowledge of material information. Incredibly, she instructed everyone on the call to "clean up" Slack by deleting messages so they would not be found in discovery. She also directed everyone to include Legal team members on all emails and messages moving forward and said that all Slack messages and emails should be "locked down" and labeled as attorney-client privileged. She said to have all discussions about the migration via Zoom rather than in writing and instructed them not to add any other employees to the so-called "locked down" Slack channel that Docusign designated attorney-client privileged.

64.     Shortly thereafter, Duprez began to delete certain Slack messages based on Rosser's direction, but she stopped quickly because she realized it was wrong and potentially unlawful.

65.     Later that evening, Cipolla asked Duprez to join a call with his supervisor JP Westwood ("Westwood"), Enterprise Group Vice President. Before Westwood joined the call, Duprez told Cipolla that Rosser had said to delete Slack messages and that Duprez felt that was wrong.

66.     When Westwood joined the call, Cipolla explained the cloud migration concerns that Duprez had raised, the contract violations, and the potential repercussions. Westwood asked Duprez to draft a summary of her concerns. As Duprez told Westwood, she had already prepared an email describing the problems, but had not sent it because the ELT had directed employees not to put any of the cloud migration concerns in writing. Westwood replied that he would speak to his supervisor, Paula Hansen ("Hansen"), President and Chief Revenue Officer and an ELT

member, and then would update Duprez. Westwood never followed up with Duprez about a discussion with Hansen.

67.    In or around mid-June 2025, Bank of America was attempting to schedule a "pen test," which is an effort to evaluate how easily one can "penetrate" the data storage system. Adams expressed concern because Bank of America could not fully test its data storage if it did not know where its data was kept.  At that time, Docusign still had not told the bank where its data was stored.  On information and belief, Bank of America ultimately only tested Docusign's on-premise server to evaluate security measures and not the Azure Cloud Servers because the bank did not know that the Company has been storing its information there.

68.    Over the following weeks, Docusign continued to deceive its customers, including Bank of America, by not disclosing that customer data was stored on the Azure Cloud Servers. The ELT instructed employees not to have any further calls with customers until they had given directions to do so.

69.    Docusign did not authorize any phone calls with customers about the migration until the second week of July 2025.

70.    By then, as set forth below, Duprez was forced out of the office due to her health. For over four weeks, Duprez used her Paid Time Off.  Duprez then sought and was approved for medical leave under the Family Medical Leave Act.  Docusign did not pay her a salary or commissions for August and subsequent months and therefore Duprez lost significant income.

<u>Duprez's Additional Complaints</u>

71.    By letter dated June 30, 2025, Duprez's counsel sent a written complaint to Jim Shaughnessy, Docusign's Chief Legal Officer, about the Company's ongoing misconduct.

72.     Specifically, Duprez complained that she had "serious concerns about the [C]ompany's conduct in connection with the already completed migration of customer data to Microsoft Azure"; and that the [C]ompany's "failure to disclose such information to the [C]ompany's customers, including financial institutions, violate[d] the law, [was] contrary to the [C]ompany's representations made to the customers," and "breach[ed] contractual obligations."

73.     Duprez also complained that the Company had "not taken remedial action even though she and others ha[d] raised concerns to, among others, management, the executive team, and in-house counsel for the [C]ompany."

74.     Finally, Duprez raised concerns about "the [C]ompany's request that she and others participate in the misconduct, including by making material misrepresentations to customers both by omission and affirmative misstatements."

75.     To the best of Duprez's knowledge, despite Duprez's many complaints, the Company has not rectified its conduct.  Instead, on information and belief, the Company has continued to mislead its customers by failing to fully disclose the extent of the data migration, including, but not limited to, not advising its customers that Docusign has already transferred most, if not all, of the information to the cloud; not alerting its customers that Docusign made false statements in attestations and during audits concerning storage of data, including personally identifiable information; and not notifying its customers that NA2, its on-premises server that has hosted the data for Bank of America and several of Docusign's other large financial services clients, is no longer stable.

<u>Duprez Is Forced to Take Medical Leave</u>

76.     Duprez's health deteriorated significantly after she learned of Docusign's repeated and ongoing misrepresentations and material omissions to clients, including Bank of America; the data migration to Azure Cloud Servers; and subsequent efforts to cover it up.

77.     Duprez's stress has had a significant negative effect on her physical and mental health. Duprez has suffered from chest pains, difficulty sleeping, increased anxiety, and elevated blood pressure. On July 11, 2025, Duprez lost consciousness twice due to the stress, resulting in a call to 911 and evaluation from emergency responders.

78.     As a result, Duprez had no choice but to take a leave of absence beginning on June 30, 2025.  Duprez's medical leave extended until December 30, 2025.

79.     During the medical leave, Docusign did not advise Duprez nor her counsel that it had remedied its fraudulent conduct.  To Duprez's knowledge, Docusign continued to engage in the fraudulent conduct through December 30, 2025.

<u>Duprez Cannot Return to Her Job</u>

80.     Docusign's actions created an untenable work environment.  As a result, Duprez could not return to work after her medical leave ended and she was therefore constructively discharged from her job on December 30, 2025.

81.     First, for years, Docusign concealed material information from Duprez and her clients.  The misconduct started no later than the fall 2023 (and the migration was completed in or around fall 2024).  No matter what actions the Company takes now, nothing changes the fact that for over two years, the Company failed to disclose to, and affirmatively concealed from, its customers the data migration.

82.     Second, after Duprez discovered the fraud, she gave the Company time to address the problems, but it failed to do so.  Duprez raised her concerns repeatedly in June 2025 asking the

Company to disclose the information to its customers. Duprez also asked Docusign to remedy the fraud through counsel. To Duprez's knowledge, to date, even after Duprez's complaints, the Company has failed to take remedial action, including failing to investigate or otherwise stopping the fraud, and the misconduct is ongoing.

83.     Not only did the Company not disclose to customers that it had moved data to the cloud long before 2025 and 2026, but it sought to cover-up its actions by directing Duprez and others to delete communications about the misconduct and improperly designate materials as privileged.

84.     Third, if Duprez had returned to work, she would have been forced to participate in the unlawful conduct. Docusign would require her to perpetuate the fraud by not disclosing to her employees and customers that the data migration had already taken place; by continuing to lie about the data migration happening in 2025 and 2026; and by covering up the misconduct.

85.     Fourth, as set forth above, Duprez has had a successful career of over 25 years in managing relationships with, and making sales to, enterprise financial services accounts. She has developed an excellent personal and professional reputation within the industry. Duprez was deeply concerned that if she continued in her role she would have been further entangled in Docusign's fraudulent scheme, which would have significantly damaged her hard-earned and vital reputation.

86.     Fifth, Duprez was unable to return to work without risking her health. Duprez's healthcare providers instructed her that she could not return to the office without significantly jeopardizing her health.

87.     As a result of the unlawful conduct, including, but not limited to, the Company's many months of fraudulently concealing its actions from customers; its blatant breaches of

customer contracts; its failure to remedy the serious concerns even after Duprez made complaints; its requirement that Duprez participate in the unlawful conduct and perpetuate the fraud against customers; its requirement that Duprez lie to her team members about what has happened; and the profound negative effect the misconduct has had on Duprez's health, Docusign made it impossible for Duprez to continue to work there.

88.     For the reasons set forth above, Duprez was unable to return to her position at the Company following her medical leave. On December 30, 2022, Docusign constructively discharged Duprez from her job.

89.     As a result of the Company's actions, Duprez has lost and will continue to lose significant income, including base salary and commissions since July 2025 and unvested equity following her constructive discharge.  Those damages are ongoing.

<u>FIRST CAUSE OF ACTION</u>
<u>Whistleblower Retaliation Under the Labor Law</u>

90.     Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     By the acts and practices described above, Defendant retaliated against Plaintiff in the terms and conditions of her employment because Plaintiff reported activity to her supervisors that she reasonably believed was illegal, including, but not limited to, Defendant's mail and wire fraud against its customers and failure to comply with privacy laws, rules, and regulations.

92.     Defendant acted with malice and/or reckless disregard to Plaintiff's rights protected under the Labor Law.

93.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's retaliatory practices

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that that this Court enter an Order:

(a)     declaring the acts and practices complained of herein to be violations of the Labor Law;

(b)     enjoining and permanently restraining the violations of the Labor Law;

(c)     directing Defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff;

(d)     directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's unlawful treatment of her and making her whole for all earnings and other benefits he would have received but for Defendant's unlawful actions, including, but not limited to, wages including back pay, front pay, bonuses, and benefits;

(e)     awarding Plaintiff such interest as is allowed by law and damages for any adverse tax consequences stemming from an award;

(f)     awarding Plaintiff the costs of this action, together with reasonable attorneys' fees; and

(g)     granting such other and further relief as this Court deems necessary and proper.

Dated: New York, New York
          February 25, 2026

                              VLADECK, RASKIN & CLARK, P.C.


               By:    _____
                      Jeremiah Iadevaia
                      James Bagley
                      Vladeck, Raskin & Clark, P.C.
                      111 Broadway, Suite 1505
                      New York, NY 10006
                      Attorneys for Plaintiff